Filed 3/8/13  P. v. Bonella CA1/4
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>RICHARD CLYDE BONELLA,<br><br>        Defendant and Appellant. | A131105<br><br>(Contra Costa County<br>Super. Ct. No. 050807958) |

A jury convicted appellant Richard Clyde Bonella of eight counts of lewd conduct with a child under 14 committed against a single victim.  (Pen. Code,[1] § 288, subd. (a).)[2] Sentenced to 22 years in state prison, he appeals.  Bonella contends that (1) his mother was improperly excluded from the courtroom during part of his trial; (2) he was erroneously precluded from questioning the victim about financial gain as a motive for bringing false charges against him; (3) inflammatory evidence was improperly admitted; (4) the trial court denied him full access to the victim's psychiatric records; (5) prosecutorial misconduct occurred during closing argument; and (6) his motion for new trial should have been granted.  We affirm the judgment.

---

[1] All statutory references are to the Penal Code unless otherwise indicated.

[2] Section 288, subdivision (a) has been amended repeatedly since the time that these crimes were committed.  (See Stats. 1987, ch. 1068, § 3, p. 3609; Stats. 1988, ch. 1398, § 1, pp. 4730-4731; Stats. 1989, ch. 1402, § 3, pp. 6139-6140.)  For our purposes, the various amended versions of this provision are substantially the same as the current version.  (See § 288, subd. (a) [Stats. 2010, ch. 219, § 7].)  Although we apply the earlier versions of this statute throughout our decision, we do not make repeated references to them.

## I. FACTS

A. *Molestation Charges by Jane Doe*

On November 5, 2007, Martinez police received a report of sexual abuse. Twenty-seven-year-old Jane Doe told an officer that her brother Richard Clyde Bonella had sexually abused her from 1984 through 1996.[3] She gave the officer a typewritten letter detailing the circumstances of the childhood abuse.

A complaint was filed in April 2008 charging Bonella with 40 counts of lewd conduct with a child under age 14. His brother Joseph Bonella[4] was also charged with three counts of lewd conduct. After his June 2008 preliminary hearing, Bonella was held to answer for 20 counts of lewd conduct. In July 2008, an information was filed charging 13 counts against him—eight counts of lewd conduct and five counts of forcible sex offenses. It also charged Joseph Bonella with two counts of lewd conduct.[5] In each count, Jane Doe was alleged to be the victim. The information also included a special statute of limitations allegation that Jane Doe was a minor at the time of each of the offenses and did not report them to police until November 2007. (§ 288, subd. (a); see former § 261, subd. (a)(2) [Stats. 1986, ch. 1299, § 1, pp. 4592-4593; Stats. 1990, ch. 630, § 1, pp. 3096-3097], § 286, subd. (c) [Stats. 1986, ch. 1299, § 3, p. 4593; Stats. 1988, ch. 1243, § 6, pp. 4133-4135; Stats. 1991, ch. 144, § 1, pp. 1350-1353], § 288a, subd. (c) [Stats. 1986, ch. 1299, § 5, pp. 4595-4596; Stats. 1988, ch. 1243, § 7, pp. 4135-4137]; see also §§ 803, subd. (f)(1), 1203.066.)

Bonella pled not guilty to all charges and denied the special allegation. His January 2009 motion to dismiss was granted as to the forcible offenses, but denied as to the remaining counts that he challenged as having been barred by the statute of

---

[3] This evidence was admitted at trial for the limited purpose of proving that the report was made, not to prove the truth of the report itself.

[4] To avoid confusion, we refer to defendant and appellant Richard Bonella by his surname and refer to his brother Joseph by his full name.

[5] In February 2009, a count of forcible sodomy originally alleged against Joseph Bonella was amended to allege that Bonella was the actual perpetrator. That count was later dismissed.

limitations. (§ 995.) In February 2009, the trial court granted his motion to sever his trial from that of Joseph Bonella.[6] When trial began in July 2010, Bonella faced eight lewd conduct charges—three committed between 1988 and 1989, two committed between 1990 and 1991, and three committed from 1991 to 1992. (§ 288, subd. (a).) During the charged time period, Jane Doe was between eight to 12 years old.

B. *Trial and Sentencing*

    1. *Molestation of Jane Doe*

Jane Doe testified at trial when she was 30 years old. Mary[7] and Ron I. were her parents. She grew up as the youngest of a family of eight children, including her half-brothers Joseph Bonella and Bonella, her sister G.P. and her brother Alexander, who was two years older than she. Bonella was about 20 years older than Jane Doe.

Jane Doe grew up in a chaotic home. Mary smoked marijuana from the time Jane Doe was four years old. Bonella smoked marijuana, too.[8] Within two or three years, Mary was using methamphetamines and cocaine. The drugs made her erratic and paranoid. Mary was often out of the home; when she was at home, she was not watching her children.[9] At trial, Jane Doe opined that Mary preferred her older brothers to her youngest child.

G.P. left home when Jane Doe was about four years old. Jane Doe told the jury that after G.P. moved out, Bonella began fondling her, touching her genitals, kissing her, engaging in mutual oral sex, digitally penetrating her, and having vaginal intercourse, and anal sex with her. He ejaculated every time, it seemed to her. Bonella watched her when

---

[6] Joseph Bonella was tried first. In June 2010, we affirmed his conviction of two counts of lewd conduct with a minor. He was sentenced to eight years in prison. (*People v. Bonella* (June 25, 2010, A125100 [nonpub. opn.].)

[7] Mary was excluded from the courtroom during the testimony of Jane Doe and Alexander I., over Bonella's objection. (See pt. II, *post*.)

[8] The jury was admonished that this evidence was admitted only for the limited purpose of showing the level of parental supervision in the home and as it bore on the credibility of Jane Doe's decision not to tell her parents about the abuse. It was not to be considered for any other purpose.

[9] There was also a suggestion that Mary had some mental health issues.

her parents were gone and he took advantage of the opportunities presented to him. His actions did not feel right to her; sometimes, they were painful. Jane Doe tried to get away, but Bonella was much bigger than she was and she was afraid of him. He told her that if she told anyone, he would hurt her.

Many times, Bonella sexually abused her in his room. Once when she was five, he did so in a camping trailer parked near the house.[10] He sometimes gave her alcohol and made her undress. Then, he had her orally copulate him and engaged in painful vaginal intercourse. Bonella did not use condoms, ejaculating inside her. From the time she was four until she was six years old, Bonella touched Jane Doe and had oral sex or vaginal intercourse with her about three times a week.

In 1988 and 1989, Jane Doe lived most of the time with Ron, but visited Mary on weekends and holidays. Ron remarried in December 1988. While he and his new wife were on their honeymoon, Jane Doe stayed with Mary at a hotel. Her mother was usually gone. One day during this visit, Bonella brought a woman to the hotel room and had sex with her while Jane Doe was on the bed with them. He used a condom with the woman. After she left, he made Jane Doe orally copulate him twice. He did not use a condom when he had vaginal intercourse with her, saying that she was his lover. On another occasion, Bonella brought a middle school girl to the hotel, kissing and fondling her in Jane Doe's presence. After the girl left, Bonella had Jane Doe orally copulate him and they had vaginal intercourse. Almost every night during 1988-1989, Bonella had her orally copulate him as a prelude to vaginal intercourse.

In 1990, Mary moved to Pittsburg. Jane Doe stayed at Mary's house at times when Bonella lived there. When Mary was gone during Christmas break, Bonella repeatedly abused Jane Doe—fondling her, engaging in oral sex, and having vaginal intercourse with the girl. If she did not resist, he would allow her to be fed. If she was

---

[10] Jane Doe testified that when she was five and a half or six years old, her father and mother separated. Her father moved into the trailer and eventually moved it to Concord. Alexander testified that their father moved the trailer to Clear Lake before his parents divorced.

not enthusiastic about his advances, Jane Doe was not fed. She estimated that this occurred 10 times during her school break. When she stayed at Mary's Pittsburg house, Joseph Bonella began fondling her breast and rubbing his penis on her.

Bonella treated Jane Doe like his girlfriend, calling her lover and being possessive and jealous. If she had a boyfriend come by, Bonella yelled at him. She was afraid to tell anyone about the abuse. Once, after she heard Bonella say that a short-haired woman was ugly, Jane Doe chopped off her own hair hoping that he would think she was ugly and would stop molesting her. A photograph of Jane Doe with her hair cut was admitted into evidence.

In 1991, Mary moved to a Walnut Creek apartment. Bonella was also there and he abused Jane Doe repeatedly—engaging in mutual oral sex, vaginal, and anal sex—while she stayed with Mary. When Jane Doe returned to live with Ron, the 11-year-old told her stepmother that she was suffering from vaginal pain, itching, and burning. Her stepmother took her to the doctor in December 1991. Jane Doe verified the date of her doctor visit by reviewing the medical record of it.[11] A redacted version of the report was admitted into evidence. (Evid. Code, §§ 1560-1562.)

About this time, Bonella was having anal sex with Jane Doe more often, because she feared becoming pregnant. She had not yet begun to menstruate, but she knew that intercourse could lead to pregnancy because her sister G.P. was newly pregnant with her first child.[12] Only 11 or 12, Jane Doe resisted Bonella, saying that she did not want to have intercourse because she feared becoming pregnant.

Bonella's sexual abuse ended after Jane Doe refused to go to Mary's home for several years. When Jane Doe was older, she returned to live with Mary. Bonella moved back in with Mary about the time of her 14th birthday in 1994. When he put his hand up

---

[11] This evidence was admitted over Bonella's objection. (See pt. IV.A., *post*.)

[12] G.P. testified that her oldest son was 17 years old at the time of trial in 2011, suggesting that these events occurred about 1994. The jury also received evidence of this child's birth certificate to establish the approximate time of Jane Doe's realization of the link between vaginal intercourse and pregnancy.

her skirt, Jane Doe told him to stop. She left her mother's home and never went back. She told her boyfriend about the last incident and he was very angry about it. He helped move Jane Doe's things from the house so that she would not have to return to live there.[13]

Jane Doe told the jury that she never told Mary about his abuse because she did not think her mother would believe her. She did not tell Ron about Bonella's sexual abuse until 2003 or 2004 because she felt unwelcome at her stepmother's house. She thought that if they knew about the abuse, they would not want her to be there and would blame her for it. She did not report it to Martinez police until November 2007 when she gave them a letter detailing Bonella's abuse. By this time, she knew that her older sister G.P. had been abused, too.

In 2009, Jane Doe testified against Joseph Bonella at his trial. The experience was very stressful, bringing back so many memories that she wanted to forget. Having to testify about sexual abuse she suffered as a child before strangers was embarrassing. Although she knew it was not her fault that the abuse happened, it still felt shameful.

2. *Other Victims of Molestation*

a. *G.P.*

G.P. was the sister of Joseph Bonella, Bonella, and Jane Doe. Joseph Bonella was the eldest. Bonella was two or three years younger than Joseph Bonella and about seven years older than G.P., who was 15 years older than Jane Doe. At the time of trial, G.P. was in her mid-40's, a married stay-at-home mother of three.

G.P. told the jury that when she was five years old, her brothers hid a stolen bicycle at home. When police asked about the bicycle, Mary offered no assistance, but G.P. showed them where it was. Later, Mary yelled at G.P. for telling the truth instead of protecting her family. G.P. told the jury that this attitude was pervasive in her family.

G.P. told the jury about her molestation at the hands of her brothers—a story similar to that Jane Doe told. When G.P. was a second-grader—about seven or eight

---

[13] Alexander testified that Jane Doe's boyfriend once fought with Bonella and that the police were called.

years old—first Joseph Bonella and then Bonella began touching her genitals. The molestation started when the family was living in San Francisco, about the time her older brothers got in trouble with Mary for bringing their girlfriends home. The brothers never touched her together or when others were in the house. They both told her that if she told anyone, she would be taken away from Mary. Bonella also told her that no one would believe her if she told them. G.P. was afraid to tell Mary what was happening.

G.P. moved to Fresno for a year when she was in third grade. Her brothers did not live with her during this year. When she moved back to San Francisco at the end of that year, Bonella and his brother continued their sexual abuse. Bonella put his hands on nine-year-old G.P.'s vagina. By this time, Mary, Bonella, and Joseph Bonella were smoking marijuana.[14]

During fourth grade, G.P. lived at Shore Acres in Pittsburg. By the time she was nine or 10 years old, if G.P. failed to do what Bonella asked while their mother was at work, he would bring G.P. to her bedroom. He would either whip her with a belt or molest her. Bonella would touch the child's vagina with his hands and would simulate intercourse with her while she was still clothed.

In the fifth grade, G.P. moved to another house in Pittsburg. Her older brothers had joined the military and were not living at home. She liked her stepfather, who was good to her. She feared that he would leave if he knew the kind of family they were. Life was better for her, so G.P. did not tell Mary what her brothers had done.

When G.P. was in the sixth grade, Joseph Bonella came home on leave. He entered her bedroom, fondled her vagina with his fingers and penetrated her. G.P. tried not to move; she pretended that she was asleep or dead. Bonella also came home on leave and told G.P. to sleep with him. He fondled her vagina when they did so. The

---

[14] The trial court instructed the jury that this evidence was admitted for the limited purpose of showing the lack of parental supervision in the family home—and how that might bear on the credibility of G.P.'s testimony—not to show that Bonella was a person of bad moral character.

touching happened more than once when G.P. was 11 or 12 years old. Bonella reminded G.P. that she was not supposed to talk about this.

In the seventh grade, G.P. lived in Pleasant Hill. By this time, Mary had divorced G.P.'s stepfather and had married Ron. Joseph Bonella was gone, but Bonella had left the military and returned to live with the family. Bonella was not working, so he was left in charge of his younger siblings while Mary and Ron were at work. When the house was empty, Bonella ordered G.P. to perform oral sex. She either complied or he hit her with a belt. G.P. testified that Bonella molested her more than 10 times during the two years that the family lived in Pleasant Hill.

Between the seventh and eighth grades, G.P. ran away from home and went to a friend's house. G.P. told her friend and her parents that the brothers were "doing things" to her. The parents talked to police about it, but G.P. would not.

When she was in the ninth grade, G.P.'s family moved to Martinez. G.P. lived there for five years—four years of high school and a year of junior college. She was 14 to 19 years old during this period. G.P. saw Mary, Bonella, and Joseph Bonella burn a light brown rock and saw them smoke marijuana with Ron. When G.P. was about 15 years old, Jane Doe was born.

While they lived at the Martinez house, Bonella began to have vaginal intercourse with G.P. He did not use condoms. He also fondled her and had her give him oral sex. It seemed to G.P. that this happened all the time. She tried to numb herself during intercourse, pretending she was somewhere else and hoping that Bonella would finish quickly. If it seemed that Bonella was taking too long, she asked him to pull out before he ejaculated. When Joseph Bonella came back to the house, he fondled G.P., and performed oral sex on her. He also began having intercourse with her. He did not use condoms, either. Bonella treated G.P. like she was his girlfriend. Sometimes, he, and Joseph Bonella argued and fought over her. When G.P. had a boyfriend, Bonella would threaten and intimidate him.

When G.P. was 18, she became pregnant. She feared that if one of her brothers was the father, the baby could be retarded. Molestation was incestuous, dirty, and

shameful, G.P. told the jury. She had an abortion.[15] Afterward, she tried to commit suicide. G.P. did not want to live in a home where her brothers could continue to abuse her. She was admitted to a mental health facility for several days after her suicide attempt.[16] She did not tell anyone at the hospital that she had been sexually abused. (See Welf. & Inst. Code, § 5150.)

By her senior year in high school, G.P. got a job and could no longer babysit Jane Doe. That job fell to the Bonella brothers. When she was 19, during the summer of 1985, G.P. left home. She never lived with her mother or her siblings again. G.P. worried about what would happen to Jane Doe once she left. She told Bonella that if he touched Jane Doe, she would tell what he had done to her. If he did not molest her sister, G.P. told him that she would remain silent about his past abuse of her.

In 1988, Jane Doe met G.P. and showed her a picture that the then-eight-year-old had drawn of the devil. Jane Doe identified the devil figure as Bonella.[17] G.P. told herself that Bonella was physically abusing Jane Doe. She was trying to start a new life and she did not want to know if sexual abuse was occurring. If G.P. knew that Bonella was abusing her sister, she would have had to do something about it.

Seven years passed before she had any contact with Bonella again. When G.P. met him, he apologized to her for "making [her] life hell." He asked for her forgiveness, saying that he was crazy and that if G.P. ever said anything about the molestation, he would commit suicide. When G.P. asked if he had molested Jane Doe, Bonella swore he had not. She told him that if he ever did, she would tell about his abuse of her.

---

[15] This evidence was admitted over Bonella's objection. (Evid. Code, § 352.) (See pt. IV.B., *post*.)

[16] G.P. testified that she had been hospitalized more than once for mental health treatment.

[17] Jane Doe testified that she showed this drawing to G.P. in 1990, when the younger girl would have been 10 years old. G.P. saved the drawing and gave it to Jane Doe years later. Jane Doe handed it over to police when she reported Bonella's molestation. It was admitted into evidence at trial.

For a long time, G.P. did not tell anyone other than her husband of the molestation she suffered from her brothers. At the end of 2007, Jane Doe told G.P. that both Bonella and Joseph Bonella had sexually abused her.[18] That admission prompted G.P. to tell Jane Doe that they had also abused her. The sisters did not offer each other any details of the abuse they suffered. Later, when the police contacted G.P., she gave them a statement about what happened to her. It was very difficult for her to talk to a stranger about this. The year before when Joseph Bonella was prosecuted, Jane Doe and G.P. discussed some details of the abuse with each other. G.P. did not tell Jane Doe everything that she had told the jury.

G.P. identified Bonella as the perpetrator of the sexual abuse she suffered from the time she was seven until she left home at age 19. She told the jury that thinking about coming to court to testify about these events made her feel sick, scared, and ashamed. She worried that she could not handle the memories and that she would be hospitalized again. Her fear that she could not handle the memories was on her mind every day. In the end, G.P. chose to come to court "[b]ecause the secrets have to stop."

b. *R.H.*

Joseph Bonella's one-time girlfriend had several grandchildren, including R.H. She told the jury that she first met Joseph Bonella when she was about five years old. He was living with her family. Several times when she was five to nine years old, while R.H. was asleep, Joseph Bonella would remove her pants, touch her genitals with his hands and orally copulate her. She told her cousins what Joseph Bonella had done, but did not tell any adult for fear that she would get in trouble. Later, her cousins told adults in the family what R.H. had said. When R.H.'s adult family members asked her about the allegations, they were very upset. Concerned that they might be mad at her, R.H. lied and said that she made up the story about Joseph Bonella.

R.H. recalled meeting Bonella when she was about seven. When she was about that age, Bonella tried to kiss her. He looked at her in a way that made her feel

---

[18] The jury was admonished that this evidence was not admitted for its truth, but to show the effect the statement had on G.P.

uncomfortable, so she left. No one in her family ever asked her about the incident and she never told anyone what Bonella did. It seemed unimportant, compared to what Joseph Bonella was doing. When she was nine years old, R.H. moved away and she did not see the brothers again. Later, she told her mother and local police what Joseph Bonella had done. She did not mention the incident involving Bonella until 2008.

In 2008, R.H. initially reported that Bonella tried to touch her vagina. At trial, R.H. told the jury that she had confused the two brothers when she made that statement. She made it clear to the jury that Bonella had not touched her genitals. In court, she identified Bonella.

### c. *L.B.*

L.B. was another grandchild of Joseph Bonella's girlfriend and a cousin of R.H. She met Joseph Bonella and his brother when she was about eight years old. When she was about nine, L.B. sometimes stayed overnight at her grandmother's house when Joseph Bonella lived there. Bonella also stayed there sometimes. L.B. told the jury that when she slept at her grandmother's house, Joseph Bonella repeatedly fondled her, placing his hands on her vagina. This occurred over a period of years.

When L.B. was about nine years old, she awoke early one morning to discover Bonella stroking her buttocks with his hands. This only happened with Bonella once. L.B. identified a photograph of Bonella as he appeared at the time of this incident. She also made an in-court identification of Bonella as the man who touched her when she was nine years old. L.B. identified Joseph Bonella as the subject of two other photographs dating from the early 1990's.[19] L.B. did not report that Bonella had touched her even after she told the police about Joseph Bonella's misconduct. She blamed herself and was embarrassed to admit that she had let this happen more than once. She first reported Bonella's conduct in 2009.

---

[19] Bonella objected to this photographic identification. (See pt. IV.C., *post*.)

11

3. *Expert Testimony*

Two expert witnesses testified about the behavior of sexual assault victims and the investigation of these offenses. A police detective told the jury that it was common for children who are sexually assaulted to delay reporting that abuse due to embarrassment, confusion, fear, and a sense that the victim is to blame. If the abuser is a family member, there is also a concern about breaking up the family. Commonly, victims fear that they will not be believed. Many victims make disclosures gradually over time. Delayed disclosure is not inconsistent with having been the victim of sexual abuse. Often, victims wait many years to make such a disclosure. Most child molestation occurs in private. Many family members say they had no idea the abuse was happening. Sometimes, there is physical evidence of sexual trauma; sometimes, there is not.

A clinical psychologist testified about child sexual abuse accommodation syndrome, in order to dispel common misperceptions about how children react to abuse. He told the jury about common aspects of child abuse accommodation: secrecy, helplessness, entrapment, delayed reporting, unconvincing disclosure, and retraction. Children often do not seek help in order to protect themselves from abuse by adults, especially when the abusers are family members or the parents have an impaired ability to keep the children safe. The children are often threatened, intimidated or bribed to keep the abuse secret. The young victims feel trapped by secrecy and helplessness. Some victims disassociate while the abuse occurs, pretending to be asleep or thinking about something else. This allows the children to avoid the bad feelings that result from abuse while it happens, but those feelings come back as the children age.

The psychologist told the jury that delayed disclosure of child sexual abuse—sometimes decades after it occurred—was not uncommon. Disclosure is a process, leading some laypersons to find the varying reports inconsistent. In fact, it is typical for a child to report some aspects of abuse and then wait to see if the listener is sympathetic or if the threatened harm does not come to pass before making further disclosures. As the child becomes an adult and grows more independent, it becomes easier to disclose what happened. Adults feel the need to tell, while children are more likely to keep things

secret out of fear. Some who report sexual abuse retract those allegations, more often when the abuser is a family member. Family pressure keeps the child silent about the abuse. The psychologist discounted the likelihood that a child would make a false allegation of sexual abuse, unless motivated by an adult, such as a parent engaged in a custody dispute.

4. *Other Prosecution Evidence*

Alexander I.—the younger brother of Bonella, Joseph Bonella, and G.P. and the older brother of Jane Doe—testified about growing up in a family household with little parental supervision. His parents went to work, leaving him and Jane Doe in the care of the Bonella brothers. His brothers gave him alcohol and marijuana from the time he was five or six years old. Eventually, his parents divorced. Mary was homeless for a time, living with friends, family, or in hotels. By the time he was 10, Alexander went to live with his father, who had remarried. It was not until 2004—when he was 26 years old— that Jane Doe told him that their older brothers had sexually abused her when she was a child.[20]

5. *Defense Case*

On cross-examination, Jane Doe admitted that she had been interviewed by members of the prosecutor's office about her allegations, but she denied being coached by them. She admitted reviewing a prosecution investigator's report and a police report before trial. She told the jury that her testimony was true—based on her memory, not on reports, transcripts, or discussions with her sister G.P.

Redacted versions of the two reports about the molestation that Jane Doe reviewed were introduced into evidence at Bonella's request. The trial court admitted them, not for the truth of the matter contained in them, but as evidence of what Jane Doe reviewed

---

[20] After the prosecution rested, Bonella moved for acquittal on statute of limitations grounds, without success. (§ 1118.1.)

before she testified.[21]  The defense argued that her testimony hewed so closely to what she reported to police that the report constituted a script for her false molestation charges.

During her testimony, Jane Doe told the jury that when she was in the sixth grade, she told a school friend that her brother was molesting her.  Called as a witness for the defense, her childhood friend testified that she did not recall Jane Doe telling her about any molestation.  She thought she would remember it, but admitted that it was possible that she did not understand the significance of what Jane Doe told her.  The witness also told the jury that from the time Jane Doe was eight or nine years old, she often appeared at her friend's house late at night on her own.  The witness's parents did not allow her to go to Jane Doe's house, because Jane Doe's parents did not supervise their children.

Jane Doe had also testified on direct examination that in 1994, Ron moved out of the house where the two of them had been living.  Ron went to live with Jane Doe's stepmother, who did not get along with Jane Doe.  Jane Doe did not want to follow Ron to the stepmother's house, but when she found herself alone at the old house with adult men to whom he rented rooms, she left home.  Eventually, Jane Doe went to stay with the Teresa L. family for six months.  While she was living there, she had an encounter with a drunken Ron that upset her.  He hugged her in a way that made her feel uncomfortable.  When the L.s asked why Jane Doe was upset, she told them what had happened.

Teresa L., the mother in that household, testified for the defense.  She confirmed that Jane Doe lived with her family for about six months when the girl was about 16 years old.  Teresa L. recalled the incident when Jane Doe became upset after an encounter with Ron.  She told the jury that Jane Doe told her that Ron had touched her in an inappropriate manner.[22]  After living with the family for six months, Jane Doe ran away from the home, aided by Teresa L.'s daughter.

---

[21] Bonella also sought admission of the writing that Jane Doe gave Martinez police in November 2007 in order to impeach Jane Doe's testimony.  The trial court excluded this evidence because it lacked impeachment value and on hearsay grounds.

[22] This hearsay statement was admitted not to prove the truth of the matter asserted, but to show that a complaint had been made.

14

Once, Jane Doe overheard a conversation about Teresa L.'s former husband having molested Teresa L.'s daughter as a child. Teresa L. had reported the molestation of her child to police and a court process ensued. Hearing about this molestation, Jane Doe disclosed to Teresa L. that her father had molested her throughout her childhood. Teresa L. considered going to the police, but Jane Doe pleaded with her not to, so she did not. A few weeks later, Jane Doe told Teresa L. that her brother Joseph Bonella had also molested her.[23]

Teresa L. suffered from chronic rheumatoid arthritis, for which she took pain medication. She admitted that in 1990, she had forged a Vicodin prescription, leading to a felony conviction. In 2008, while under the influence of prescription medication, Teresa L. lost consciousness while driving, and her car struck a tree. That incident led to a conviction for driving while under the influence. She denied having a substance abuse problem in between these incidents.

During her testimony, Jane Doe had told the jury that in 1987, Bonella gave her a kitten and said she could keep it if she was a good girl. A month later, according to Jane Doe, Bonella decapitated the kitten. In Alexander's cross-examination, Bonella brought out evidence that the family never had cats in their home. Alexander also testified that Jane Doe and G.P. seemed happy when they were growing up.

Outside the presence of the jury, Bonella sought to introduce evidence of Jane Doe's mental state, based on psychiatric records. The trial court reviewed those records in camera, releasing some to the defense, but ruling that most of them were not relevant. (See pt. V., *post*.)

6. *Argument*

During closing argument, both sides agreed that the case turned on the credibility of the witnesses. Bonella argued that Jane Doe's story was unbelievable. During

---

[23] On cross-examination, Teresa L. admitted that Jane Doe was gradually revealing information about molestation. Jane Doe never told Teresa L. that Bonella was not molesting her. The questioning suggested that she might have revealed that Bonella molested her if she had not left their home after six months.

rebuttal, he raised numerous objections to the prosecutor's arguments. Outside the presence of the jury, he moved for a mistrial on prosecutorial misconduct grounds. Rejecting that assertion, the trial denied the motion for mistrial. (See pt. VI., *post*.)

### 7. *Verdict and Sentencing*

In July 2010, the jury found Bonella guilty of all eight lewd conduct charges and made the special findings needed to establish that the charges were filed within the statute of limitations. One of these findings was that independent evidence clearly and convincingly corroborated Jane Doe's allegations. (§§ 803, subd. (f), 1203.066.) Bonella's motion for new trial on grounds of newly discovered evidence was denied. (See pt. VII., *post*.) In December 2010, the trial court sentenced Bonella to 22 years in state prison—an upper base term of eight years for the principal lewd conduct offense, and two-year consecutive one-third midterms for each of the other seven offenses.

## II. EXCLUSION OF MOTHER

### A. *Trial Court Ruling*

First, Bonella contends that the trial court violated his constitutional rights to due process and a public trial by excluding his mother from the courtroom during part of his trial. (U.S. Const., 6th & 14th Amends.; Cal Const., art. I, §§ 15, 29.) Before trial, Bonella and the prosecution both successfully moved to exclude witnesses from the courtroom when they were not testifying. The prosecution listed Mary—the mother of Bonella and Jane Doe—as a potential witness. When questioned, the prosecutor explained that while she did not plan to call Mary as a witness, it was theoretically possible that she would do so.

During trial, Alexander—who testified before Jane Doe did—came to court with their mother Mary. At the prosecution's request, Mary was ordered excluded from the courtroom. After Alexander's testimony was completed, Bonella objected to this exclusion, arguing that his right to a public trial included the right to have his family attend the proceedings. He reasoned that as neither side intended to call Mary as a witness, it was improper to exclude her.

16

The prosecutor explained that Mary still remained a potential witness, because she gave a statement to police that corroborated some aspects of Jane Doe's statements and Alexander's testimony. Depending on what evidence Bonella had yet to draw from Jane Doe, the prosecutor might call Mary as a witness. To prevent Mary's possible testimony from being tainted, the prosecutor sought her exclusion from the courtroom. She noted that she did not ask to exclude Mary until Alexander—who testified early in the trial—began his testimony. Once Jane Doe completed her testimony, the prosecution would not oppose Mary's presence in court. The trial court did not exclude Mary for the entire trial, but—over Bonella's objection—found that her exclusion during Alexander's testimony had been warranted and would continue until Jane Doe's testimony was complete. Mary was not called to testify at trial.

B. *Exclusion of Potential Witness*

Bonella's constitutional argument wrongly assumes that Mary served merely as a spectator and support person. Our analysis of this issue turns on the propriety of the trial court's decision to exclude Mary as a potential witness. A trial court has a duty to control criminal proceedings in a manner that promotes the ascertainment of truth about the matters involved in the case. (§ 1044.) It has discretion to exclude from the courtroom any witness who is not then being examined, so that the witness cannot hear the testimony of other witnesses. (Evid. Code, § 777, subd. (a).) The exclusion discourages tailored testimony and helps the jurors detect false testimony. (*Geders v. United States* (1976) 425 U.S. 80, 87; *People v. Valdez* (1986) 177 Cal.App.3d 680, 687.) The discretion afforded to the trial court to fashion an appropriate exclusion order is quite broad. (*People v. Garbutt* (1925) 197 Cal. 200, 206-207; *People v. Valdez, supra,* 177 Cal.App.3d at p. 687; *People v. Willingham* (1969) 271 Cal.App.2d 562, 571; see *Geders v. United States, supra,* 425 U.S. at p. 87; Fed. Rules Evid., rule 615(a); see also 5 Witkin & Epstein, Cal. Criminal Law (4th ed. 2012) Criminal Trial, § 648, pp. 1003-1005; 3 Witkin, Cal. Evidence (5th ed. 2012) Presentation at Trial, § 85, pp. 137-139.) On appeal, we determine whether the trial court abused that discretion.

17

Bonella argues that Mary was not a witness within the meaning of section 777, subdivision (a) of the Evidence Code. Although the authority to exclude a witness under this provision does not explicitly apply to both actual and potential witnesses as section 867 provides at a preliminary hearing, both statutes have the same purpose.[24] Indeed, it would defeat the purpose of Evidence Code section 777 if its authority did not apply to potential witnesses. We are satisfied that the trial court's discretion to exclude a witness at trial extends to a witness whose testimony may be needed later in the trial.

The prosecutor's statement that she did not plan to call Mary as a witness does not alter our conclusion. The prosecutor made it clear that while Mary's testimony was not integral to her case-in-chief, she might be needed to corroborate the testimony of Alexander or Jane Doe, as the trial testimony unfolded. The limited exclusion of Mary from the courtroom during the testimony of these two witnesses furthered the purpose of the statute by preventing the mother from hearing testimony about subjects which she herself might be called upon to testify. (Evid. Code, § 777, subd. (a).) The trial court did not abuse its discretion in ordering the limited exclusion of Mary during the testimony of these two witnesses.

C. *Right to Public Trial*

Bonella argues that Mary's exclusion violated his right to a public trial. An accused has a right protected by both the federal and state Constitutions to a trial that is open to the general public at all times. (U.S. Const., 6th & 14th Amends.; Cal Const., art. I, §§ 15, 29; *People v. Woodward* (1992) 4 Cal.4th 376, 381-382 [federal and state rights coextensive]; *People v. Bui* (2010) 183 Cal.App.4th 675, 680.) The right to a public trial benefits the accused, allowing the public to see the trial is fair. The presence of spectators conveys to the jury a sense of the importance of its role in the trial. It also ensures that the judge and prosecutor carry out their duties in a responsible manner and

---

[24] Bonella himself cited both statutory provisions in his motion in limine asking that witnesses be excluded from the courtroom when they were not testifying and requiring counsel for both sides to admonish them not to confer with other witnesses about the subject of their testimony.

18

discourages witnesses from offering perjured testimony. (*Waller v. Georgia* (1984) 467 U.S. 39, 46; *People v. Woodward, supra,* 4 Cal.4th at p. 385.)  The public trial right includes the right of an accused to have supportive family and friends present during the proceedings.  (*In re Oliver* (1948) 333 U.S. 257, 271-272.)

When the general public is entirely or substantially excluded from trial proceedings, the right to a public trial is clearly implicated, requiring a balancing of competing interests and specific written findings to demonstrate that the exclusion was necessary.  (*Waller v. Georgia, supra,* 467 U.S. at pp. 44-45; *People v. Woodward, supra,* 4 Cal.4th at p. 383.)  Such a denial of a public trial constitutes structural error requiring reversal per se.  (*People v. Woodward, supra*, 4 Cal.4th at p. 381; *People v. Bui, supra,* 183 Cal.App.4th at p. 680; *People v. Esquibel* (2008) 166 Cal.App.4th 539, 551-552; see *Waller v. Georgia, supra,* 467 U.S. at pp. 49-50.)

However, not every exclusion of some spectators rises to the level of a constitutional violation.  Some exclusions are so "de minimis" that they do not violate the public trial right.  (*People v. Woodward, supra,* 4 Cal.4th at pp. 384-386; *People v. Bui, supra,* 183 Cal.App.4th at pp. 682-684.)  The partial exclusion of spectators does not raise the same constitutional concerns as a total exclusion, because the remaining audience ensures the fairness of the proceedings.  In these circumstances, a trial court's exclusion of some spectators will be upheld if a substantial reason supports the exclusion. (*U.S. v. Osborne* (1995) 68 F.3d 94, 98-99.)  Even the temporary exclusion of selected supporters of the accused may fall under the "de minimis" rule, such that it does not violate the fundamental constitutional right to a public trial.  (*People v. Bui, supra,* 183 Cal.App.4th at pp. 688-689; *People v. Esquibel, supra,* 166 Cal.App.4th at pp. 543, 549, 554.)

The exclusion of defendant's family members has been upheld against a right to public trial challenge when those persons were witnesses at trial.  (*People v. Sprague* (1879) 53 Cal. 491, 493.)  We are satisfied that Mary's exclusion did not violate Bonella's constitutional right to a public trial but fell within the "de minimis" rule.  The trial court's authority to exclude her as a potential witness provides a substantial reason

19

for the exclusion order.  (See *U.S. v. Osborne, supra,* 68 F.3d at pp. 98-99.)  In the case before us, the trial court's order was narrowly tailored, excluding Mary only during the testimony of the two witnesses whose testimony she may have been called to corroborate.  (See, e.g., *Waller v. Georgia, supra,* 467 U.S. at p. 45; *People v. Esquibel, supra,* 166 Cal.App.4th at p. 554.)  Bonella does not argue that Mary was excluded from other aspects of the trial or that other supporters were excluded.  The trial court's narrow exclusion order did not violate Bonella's right to a public trial.[25]

## III.  VICTIM COMPENSATION

A. *Disability Benefits*

  1. *Relevance*

Next, Bonella contends that he was wrongly precluded from questioning Jane Doe about financial gain she achieved as a result of her molestation allegations.  He argues that this error violated his federal constitutional rights to confrontation and due process.  (See U.S. Const., 6th & 14th Amends.)  At trial, he sought to question Jane Doe about disability payments she received because she was unable to work due to a post traumatic stress disorder resulting from sexual abuse.  The trial court conducted a foundational hearing outside the presence of the jury at which Jane Doe testified that she received disability payments for both a physical disability and because of post traumatic stress disorder.  She told the trial court that even if Bonella was acquitted, she would continue to receive full disability payments.  (Evid. Code, § 402.)  Finding that Bonella's proffered evidence had no probative value and was unduly prejudicial—in part because it was intrusive to Jane Doe, in part because it might confuse the jury and consume undue time—the trial court excluded it.  (Evid. Code, §§ 350, 352.)

An accused has a constitutional right to confront and cross-examine adverse witnesses.  (U.S. Const., 6th Amend.; Cal Const., art. I, § 15; *Davis v. Alaska* (1974) 415

---

[25] An accused also has a due process right to have his or her relatives present.  (*In re Oliver, supra,* 333 U.S. at pp. 271-272; *People v. Esquibel, supra,* 166 Cal.App.4th at p. 553.)  For the same reason that we find no violation of Bonella's right to a public trial, we also find no due process violation.  (See *People v. Sprague, supra,* 53 Cal. at p. 493 [exclusion of family members who are witnesses at trial was proper].)

U.S. 308, 315; *People v. Cromer* (2001) 24 Cal.4th 889, 896-897; *People v. Ardoin* (2011) 196 Cal.App.4th 102, 118.) Denial of this right deprives the accused of an opportunity to test the credibility of the prosecution's witnesses, calling into question the integrity of the jury's verdict. (*Chambers v. Mississippi* (1973) 410 U.S. 284, 295; *People v. Cromer, supra,* 24 Cal.4th at p. 897.) Exposing a witness's credibility— including his or her motive for testifying—is a proper function of the constitutional right of cross-examination. (*Delaware v. Van Arsdall* (1986) 475 U.S. 673, 678-679; *People v. Ardoin, supra,* 196 Cal.App.4th at p. 118; see *People v. Redmond* (1981) 29 Cal.3d 904, 913 [victim compensation evidence properly excluded].)

Still, the right of confrontation is not absolute. In the exercise of this right, the accused and the state must both comply with rules of procedure and evidence intended to assure that the jury's ultimate determination is fair and reliable. (*People v. Ardoin, supra,* 196 Cal.App.4th at p. 118.) A proper application of rules of evidence does not impermissibly infringe on a defendant's due process rights. (*Id.* at pp. 119, 122.)

At the foundational hearing, Jane Doe testified that her disability payments would *not* be altered by the outcome of Bonella's trial. Hearing this, the trial court ruled that her testimony on this subject was not relevant. We conclude that this ruling was correct. When determining the credibility of a witness, the jurors may consider any matter that has a tendency in reason to prove or disprove the witness's testimony, including the existence of an interest or other motive for offering his or her testimony. (Evid. Code, §§ 210, 350, 780; *People v. Harris* (2005) 37 Cal.4th 310, 337.) However, Jane Doe's testimony did not provide any evidence of financial motive. The trial court did not abuse its discretion when concluding that Jane Doe's testimony would not be relevant. (*People v. Harris, supra,* 37 Cal.4th at p. 337.)

2. *Evidence Code Section 352*

In addition to its relevance ruling, the trial court also found that Bonella's proffered evidence was more prejudicial than probative. (Evid. Code, § 352.) A trial judge has wide latitude to impose reasonable limits on cross-examination to preclude questioning about matters that are only marginally relevant. The exclusion of

impeachment evidence on collateral matters which have only a slight probative value on a witness's veracity does not infringe on the right to confrontation. (*Delaware v. Van Arsdall, supra,* 475 U.S. at p. 679; *People v. Redmond, supra,* 29 Cal.3d at p. 913; *People v. Ardoin, supra,* 196 Cal.App.4th at p. 119.) When a trial court properly restricts cross-examination as more prejudicial than probative, no Sixth Amendment violation arises unless the prohibited cross-examination might reasonably have produced a significantly different impression of the witness's credibility. (*People v. Ardoin*, *supra*, 196 Cal.App.4th at pp. 119, 122.)

The admissibility of the proffered evidence was subject to the trial court's exercise of discretion to exclude evidence that was more prejudicial than probative. We review this decision for an abuse of discretion—for an error constituting a miscarriage of justice. (*People v. Ardoin, supra,* 196 Cal.App.4th at p. 121; see Evid. Code, § 352.) Even if the disability benefits evidence had some minimal probative value, its admission was highly prejudicial, as it could have confused the jury and consumed undue time. The trial court acted within its discretion when it precluded Bonella from cross-examining Jane Doe about her receipt of disability payments. As such, its ruling did not implicate Bonella's constitutional rights to confrontation or his due process rights. (See *Delaware v. Van Arsdall, supra,* 475 U.S. at p. 679; *People v. Redmond, supra,* 29 Cal.3d at p. 913; *People v. Ardoin, supra,* 196 Cal.App.4th at p. 119.)

B. *Restitution*

Bonella also contends that he should have been permitted to discover evidence of proceeds that Jane Doe received from the Victim Compensation and Government Claims Board. He reasons that because he was not permitted to discover this evidence, its exclusion from evidence violated his federal constitutional right to confrontation and to due process. (See U.S. Const., 6th & 14th Amends.) Before trial, he made an oral motion in limine seeking disclosure of evidence of funds paid to Jane Doe as restitution, reasoning that this provided her with a financial incentive to offer false testimony against him. The prosecution noted that because even victims who failed to cooperate with the prosecution received benefits, there was no payment for prosecuting.

22

Without explaining its reasoning, the trial court ruled that any proffered evidence of restitution would be excluded. Bonella did not press the trial court for its rationale. Later, when denying his related motion for mistrial, the trial court ruled that reimbursement funds or other victim compensation did not constitute being paid to be in court, and thus did not constitute financial gain. (See pt. VI.B.5., *post*.)

Assuming arguendo that the trial court's ruling on the motion in limine was sufficient to preserve this issue for determination on appeal, we would conclude that its evidentiary ruling was proper. (See *People v. Ramos* (1997) 15 Cal.4th 1133, 1171.) The trial court's implied determination that the evidence did not tend to establish a motive for Jane Doe to make a false accusation against Bonella—or at best, provided insufficient probative value to outweigh its prejudicial effect—would not constitute an abuse of discretion. (*People v. Harris, supra,* 37 Cal.4th at p. 337 [relevance]; *People v. Ardoin, supra,* 196 Cal.App.4th at p. 121 [352 ruling].) The purpose of victim restitution is to *reimburse* the victim for an *economic loss* suffered as a result of a criminal's acts. (See, e.g., § 1202.4, subd. (a)(1).) Thus victim restitution does not represent any *financial gain*. The exclusion of evidence having no probative value about Jane Doe's veracity did not infringe on Bonella's right to confrontation or other due process rights. (*Delaware v. Van Arsdall, supra,* 475 U.S. at p. 679; *People v. Redmond, supra,* 29 Cal.3d at p. 913; *People v. Ardoin, supra,* 196 Cal.App.4th at pp. 119, 122.)

## IV. ADMISSION OF EVIDENCE

### A. *Jane Doe's Vaginal Itching and Pain*

Bonella also contends that highly inflammatory and misleading evidence was improperly admitted against him. He first argues that the trial court violated his due process rights by admitting evidence of Jane Doe's vaginal itching and pain that was not linked to sexual abuse. (See U.S. Const., 14th Amend.)

In the trial court, Bonella filed a motion in limine to exclude evidence of Jane Doe's 1991 yeast infection and vaginal itching because she did not specifically link these ailments to his conduct. The prosecution argued that the evidence was relevant to show that Jane Doe was abused at this time, because she recalled visiting the doctor during this

period when Bonella abused her. Bonella—noting that Jane Doe asserted that both he and Joseph Bonella abused her during this time—argued that the evidence was irrelevant and was more prejudicial than probative. (Evid. Code, § 352.) The trial court admitted a redacted version of the medical report to establish the timing of Jane Doe's vaginal complaint to the doctor. It excluded the doctor's specific diagnosis of a yeast infection as hearsay evidence.

At trial, Jane Doe testified that in 1991, she suffered vaginal itching and pain that prompted her to see a doctor during a period in which Bonella often engaged in vaginal intercourse with her. The sanitized report corroborating this doctor visit was admitted into evidence. The prosecution referred to the medical report during closing argument as corroboration of Jane Doe's testimony that she suffered from a vaginal ailment in 1991.

We are guided by the legal principle that all relevant evidence is admissible. (Evid. Code, §§ 210, 350.) Relevant evidence has a tendency in reason to prove any disputed fact of consequence to the action. (*Id*., § 210; *People v. Riggs* (2008) 44 Cal.4th 248, 289-290.) A trial court has broad discretion to determine the relevance of evidence. On appeal, we review the trial court's ruling for an abuse of discretion. (*People v. Howard* (2010) 51 Cal.4th 15, 31; *People v. Riggs, supra,* 44 Cal.4th at pp. 289, 292; *People v. Harris, supra,* 37 Cal.4th at p. 337.)

Bonella argues that the medical report was highly prejudicial because the condition Jane Doe suffered was not linked with the claim of his sexual abuse of her. We disagree. The medical report was admitted to establish that 11-year-old Jane Doe complained of vaginal discomfort. Evidence of the timing of her complaint tended to corroborate Jane Doe's testimony about the timing of the sexual abuse she suffered during the relevant time.

The amended information alleged that offenses occurred during three distinct time periods. The prosecution had the burden of proving the commission of offenses during each time period beyond a reasonable doubt. Thus, it was entitled to put on evidence relevant to prove that timing. Jane Doe testified that her doctor visit followed a period of sexual abuse by Bonella. The medical report, combined with Jane Doe's testimony,

24

allowed the jurors to reach a reasonable inference that Bonella was sexually abusing her in 1991. Thus, the medical report was relevant because it had a tendency in reason to prove a fact in dispute in the matter, including the credibility of Jane Doe. (Evid. Code, § 210.) The trial court did not abuse its discretion finding that the medical report was relevant to corroborate Jane Doe's testimony of sexual abuse. This evidence is also independent corroboration as required by the Statute of Limitations.

A trial court has the authority to exclude even relevant evidence if its probative value is substantially outweighed by its prejudicial effect. (Evid. Code, § 352; *People v. Riggs, supra,* 44 Cal.4th at p. 290.) Prejudicial evidence is not merely damaging evidence, but evidence that creates a substantial likelihood that it will inflame the jury, which will then use the evidence for an improper purpose. (*People v. Scott* (2011) 52 Cal.4th 452, 491; *People v. Howard, supra,* 51 Cal.4th at p. 31.) Evidence is substantially more prejudicial than probative if it poses an intolerable risk to the fairness of the proceedings or the reliability of the outcome. We review a trial court's Evidence Code section 352 ruling for an abuse of discretion. (*People v. Riggs, supra,* 44 Cal.4th at p. 290.) We are satisfied that the trial court did not abuse its discretion by denying Bonella's motion to exclude the medical report as more prejudicial than probative.

The admission of relevant evidence does not violate due process unless the evidence renders the trial unfair. (*People v. Falsetta* (1999) 21 Cal.4th 903, 913; *People v. Nguyen* (2010) 184 Cal.App.4th 1096, 1116.) As we find no risk to the fairness of the proceeding or the reliability of the verdict stemming from the admission of the medical report, we reject Bonella's due process claim of error.

B. *G.P.'s Pregnancy and Abortion*

Bonella also challenges the trial court's admission of evidence of G.P.'s pregnancy and abortion. As those events were not specifically linked to his conduct, he reasons that the admission of this evidence violated his federal right to due process. At trial, Bonella objected when the prosecutor indicated an intention to question G.P. about her teenage pregnancy and abortion. The prosecution argued that the evidence was relevant to bolster Jane Doe's testimony that the Bonella brothers sexually abused her,

25

and to show G.P.'s emotional reaction to her own sexual abuse. The trial court ruled that the evidence was admissible, rejecting Bonella's claim that it was more prejudicial than probative. (Evid. Code, § 352.) At trial, G.P. testified that both Bonella brothers had intercourse with her. When she became pregnant at age 18, she had an abortion, fearing that one of her brothers was the incestuous father of a her unborn child.

On appeal, Bonella contends that this evidence was not sufficiently relevant to be admissible because G.P. did not testify that she was not having sexual intercourse with anyone other than her brothers. He reasons that its lack of relevance to prove sexual abuse, combined with its tendency to invoke an emotional bias from the jurors, warranted its exclusion as more prejudicial than probative. (Evid. Code, § 352.)

We disagree, for two reasons. First, we reject Bonella's claim that the evidence was completely irrelevant. G.P.'s testimony about her pregnancy and her motive for having an abortion—because she feared that one of her brothers *might* have fathered her child—had a tendency to corroborate her testimony that Bonella had sexually abused her. G.P.'s credibility about Bonella's sexual abuse was a key issue in dispute at trial. (See Evid. Code, § 210.) A trial court has broad latitude to determine the relevance of evidence, which we evaluate on appeal for an abuse of discretion. (*People v. Scott, supra,* 52 Cal.4th at p. 490.) The fact that G.P. did not identify Bonella as the only possible father of her child did not render the proffered evidence irrelevant.

We also reject the claim that the trial court abused its discretion when it denied Bonella's motion to exclude this testimony. The *undue* prejudice that Evidence Code section 352 seeks to avoid is *not* that naturally flowing from relevant, highly probative evidence. Instead, the statute attempts to avoid the prejudging of a case based on *extraneous* facts. (*People v. Scott, supra,* 52 Cal.4th at p. 491; *People v. Zapien* (1993) 4 Cal.4th 929, 958.) Evidence should be excluded as unduly prejudicial when it inflames the emotions of the jurors, motivating them to use the information, not to logically evaluate the point on which it is relevant, but to reward or punish one side because of the jurors' emotional reaction. The evidence is unduly prejudicial if there is a substantial

26

likelihood that the jurors will use it for an illegitimate purpose. (*People v. Scott, supra,* 52 Cal.4th at p. 491.)

We are satisfied that this evidence was not unduly prejudicial in this sense. We have already found that the evidence was more than a little relevant to the issues. Pregnancy is a natural consequence of vaginal intercourse. An abortion is also a possible consequence of the incestuous acts of intercourse that G.P. testified about, rather than an extraneous fact having little effect on the issues. Her testimony about pregnancy and abortion was no more sensational than the years of childhood sexual abuse that Jane Doe and G.P. testified had occurred. In the context of these allegations, G.P.'s testimony did not uniquely tend to evoke an emotional bias against Bonella based on minimally relevant evidence. (*People v. Bolin* (1998) 18 Cal.4th 297, 320; *People v. Yu* (1983) 143 Cal.App.3d 358, 377.) The evidence did not create a substantial likelihood that it would be used for an illegitimate purpose. (*People v. Scott, supra,* 52 Cal.4th at p. 491.) The proffered evidence also did not pose an intolerable risk to the fairness of the proceedings or the reliability of the outcome. Thus, the trial court's admission of this testimony was not an abuse of discretion and did not violate Bonella's due process rights. (See *People v. Falsetta, supra,* 21 Cal.4th at p. 913; *People v. Nguyen, supra,* 184 Cal.App.4th at p. 1116.)

C. *L.B.'s Identification of Booking Photographs of Bonella and His Brother*

Bonella also challenges the trial court's admission of past photographs of himself and his brother to allow L.B. to identify him and Joseph Bonella. He asserts that the trial court's failure to exclude these booking photographs as suggestive of other uncharged misconduct violated his federal due process rights. In the trial court, Bonella objected that the booking photographs were unduly suggestive of other criminal activity. The prosecutor planned to use the photographs of the two brothers at a younger age to allow L.B. to differentiate between the brothers. She noted that in his opening statement, Bonella's counsel had suggested that L.B. had confused the two brothers. Twenty years had passed since the events about which L.B. would testify, making the older

photographs more relevant than an in-court identification. The prosecutor also argued that the photographs would not appear to be booking photographs to laypersons.

The trial court examined the photographs and ruled that they were probative on identification, that the head shots did not suggest that they were booking photographs, and that the admission of this evidence was not unduly prejudicial. (Evid. Code, § 352.) When L.B. testified at age 25, she reviewed the photographs and identified one as Bonella and two others as Joseph Bonella as they appeared at the time that each molested her as a child. These three photographs were admitted into evidence.

On appeal, Bonella challenges the admission of these photographs into evidence. He suggests first that the evidence was not relevant. The trial court thought otherwise, given the identification issues inherent in an offense committed many years earlier when L.B. was a child. We conclude the trial court did not abuse its broad discretion to determine that this evidence was relevant on identification. (*People v. Howard, supra,* 51 Cal.4th at p. 31; *People v. Riggs, supra,* 44 Cal.4th at pp. 289, 292; *People v. Harris, supra,* 37 Cal.4th at p. 337.)

Bonella also contends that the photographs were seen by the jurors as booking photographs. A booking photograph taken before the present charges were made carries the implication that the person depicted in the photograph suffered previous arrests and may have been convicted of other offenses. (*People v. Vindiola* (1979) 96 Cal.App.3d 370, 384, disapproved on other grounds in *People v. Carter* (2003) 30 Cal.4th 1166, 1197-1198.) This photographic evidence is prejudicial because it suggests that the photographed person has a bad character. The admission of such evidence may constitute an abuse of discretion. (*People v. Williams* (2009) 170 Cal.App.4th 587, 609-610.)

In the matter before us, the trial court made the factual finding that the head shots of Bonella and Joseph Bonella would not suggest to lay jurors that they were booking photographs. We review a trial court's factual finding for substantial evidence. (*People v. Leyba* (1981) 29 Cal.3d 591, 596-597.) Having reviewed the photographs, we are satisfied that there is substantial evidence to support the trial court's finding. The photographs do not have the "familiar and unmistakable appearance" of booking

photographs. There is no blanked over area at the bottom showing something that has been blocked off, nor do the photographs appear to be wooden or expressionless as mug shots often do. (See *People v. Vindiola, supra,* 96 Cal.App.3d at p. 383, fn. 4.)

As the trial court's finding that the photographs did not suggest that they had been taken at the time of an earlier arrest, Bonella cannot establish the prejudice that he claims from the admission of these images. The evidence had probative value, did not have the prejudicial effect that Bonella feared, and thus did not create the substantial likelihood that they would be used for an illegitimate purpose. (*People v. Scott, supra,* 52 Cal.4th at p. 491.) The trial court did not abuse its discretion when it denied his motion to exclude the photographs, nor did the admission of this evidence violate Bonella's due process rights. (Evid. Code, § 352; see *People v. Falsetta, supra,* 21 Cal.4th at p. 913; *People v. Nguyen, supra,* 184 Cal.App.4th at p. 1116.)[26]

## V. PSYCHIATRIC RECORDS

A. *Trial Court Rulings*

Next, Bonella contends that the trial court denied him access to the victim's psychiatric records and the transcript of the court's in camera review of these records. He asks us to conduct an independent review of the sealed records, to determine these issues. He reasons that undisclosed records should have been disclosed, and that the failure to disclose them violated his due process right to a fair trial and his right to confront witnesses against him.

Before trial, Bonella attempted to subpoena Jane Doe's psychiatric records. The hospital did not produce the documents, prompting an order to show cause hearing to allow the hospital to be heard about the propriety of the subpoena. The hospital argued that it had no authority to produce privileged information its psychotherapists obtained from Jane Doe. It reasoned that it was required to assert psychotherapist and sexual assault counselor privileges protecting Jane Doe's disclosures. (See Evid. Code, §§ 1010,

---

[26] As we find no error in the admission of these items of evidence, we necessarily reject Bonella's claim that the cumulative effect of these claimed errors deprived him of a fair trial.

1015, 1035.8, 1036.) The prosecution also filed a motion to quash the subpoena. Bonella argued that the trial court could conduct an in camera review to determine if the records contained relevant evidence. The trial court concluded that Bonella's subpoena lacked the required specificity. It granted the motion to quash. (See Code Civ. Proc., §§ 1985, 1985.3; *People v. Hammon* (1997) 15 Cal.4th 1117, 1122-1128.)

The People filed a motion in limine to preclude any mention of Jane Doe's mental health issues. The prosecution argued that evidence of a suicide attempt and her resulting hospitalization and loss of custody of her minor daughter were irrelevant. Bonella was unwilling to concede that Jane Doe's mental illness did not affect her credibility, but indicated that he would raise that issue after she testified. The trial court deferred ruling on this issue.

In the midst of Jane Doe's testimony, Bonella renewed his call for an in camera review of her psychiatric records. He reasoned that because she was in tears during much of her testimony, her demeanor was an issue bearing on her credibility. The records might reveal a mental condition that would explain her emotionality. The prosecution asserted Jane Doe's psychotherapist-patient privilege. The trial court ruled that Bonella's proffer of good cause to review the psychiatric records was generic and insufficient. Despite this finding, it reviewed the records in camera, over the prosecution's objection that the lack of good cause precluded review. In a sealed transcript of this review, the trial court searched for exculpatory evidence that, if not disclosed, would deprive Bonella of a fair trial.

After the in camera review, the trial court disclosed a medical report from December 2006 in which Jane Doe answered "no" to an inquiry about whether she had ever felt afraid of her partner, ex-partner, or family member. It found this report to be inconsistent with Jane Doe's testimony that she was threatened not to report the sexual abuse she suffered. It also disclosed an October 2004 medical history, in which Jane Doe denied that anyone had forced her to engage in sexual activities that made her uncomfortable. The trial court provided redacted copies of these two reports to Bonella's counsel.

30

B. *Legal Principles*

A witness's mental illness or emotional instability may be relevant to his or her credibility. A witness may be cross-examined about these matters if they might affect his or her ability to perceive, recall, or describe key events. (*People v. Gurule* (2002) 28 Cal.4th 557, 591-592; see *Delaware v. Van Arsdall, supra,* 475 U.S. at pp. 678-679; *Davis v. Alaska* (1974) 415 U.S. 308, 318.) However, records of mental illness may be privileged as psychotherapist-patient communications or communications of a sexual assault victim to a sexual assault counselor. (Cal. Const., art. I, § 1; Evid. Code, §§ 1014, 1035.8.) If records are privileged, their disclosure at trial may still be required if the defendant's need for the information outweighs the witness's interest in confidentiality. When determining the need for disclosure of these privileged records, the trial court balances the defendant's right to cross-examination against the policies that the underlying privilege is intended to serve. (*People v. Gurule, supra,* 28 Cal.4th at p. 592 [psychotherapist-patient privilege]; *People v. Hammon, supra,* 15 Cal.4th at pp. 1123-1124, 1127 [psychotherapist-patient privilege].) We analyze Bonella's claims in light of his due process right to a fair trial, more than his Sixth Amendment right to confront witnesses. (*Pennsylvania v. Ritchie* (1987) 480 U.S. 39, 56.)

C. *Propriety of Appellate Review*

Preliminarily, the Attorney General argues that because the trial court found that Bonella failed to make a showing of good cause for in camera review in the trial court, we should summarily reject his request that we conduct an in camera review of the sealed, privileged records. The view that in camera review is itself a breach of privilege and an invasion of privacy comes from older appellate rulings. (See *People v. Dancer* (1996) 45 Cal.App.4th 1677, 1692, fn. 8, disapproved on other grounds in *People v. Hammon, supra,* 15 Cal.4th at p. 1123; *People v. Pack* (1988) 201 Cal.App.3d 679, 685-686, disapproved on other grounds in *People v. Hammon, supra,* 15 Cal.4th at p. 1123.) Despite these concerns, in recent years, the California Supreme Court has repeatedly conducted appellate in camera reviews of privileged records—in some cases in which the records were reviewed in camera in the trial court and in at least one case in which the

31

trial court did not conduct such a review. (See, e.g., *People v. Martinez* (2009) 47 Cal.4th 399, 450, 453-454, & fn. 13 [juvenile dependency records reviewed by trial court]; *People v. Gurule, supra,* 28 Cal.4th at p. 595 [psychiatric records not reviewed by trial court]; *People v. Webb* (1993) 6 Cal.4th 494, 517, fn. 15, 518 [psychiatric records repeatedly reviewed by trial courts].)

As the California Supreme Court has explained, an appellant who challenges a trial court's refusal to disclose privileged information must do the best he or she can with the information that he or she has, relying on the appellate court to fill in the gap by objectively reviewing the records that the trial court declined to disclose. The purpose of that appellate review is to determine whether the nondisclosed records were material and should have been disclosed. (*People v. Martinez, supra,* 47 Cal.4th at p. 453.) The issue of whether the defendant failed to show good cause for in camera review is moot once the trial court actually reviewed the records. (*People v. Dancer, supra,* 45 Cal.4th at p. 1692.) Thus, we are satisfied that the California Supreme Court anticipates that we will conduct an in camera review on appeal of the sought-after records, even if the defense did not show good cause for the trial court's in camera review.

D. *Review*

Accordingly, we have reviewed the sealed records to determine if they contain any material evidence. Evidence is material only if there is a reasonable probability that if it had been disclosed to the defense, the result of the proceeding would have been different. A reasonable probability is one sufficient to undermine our confidence in the outcome of the proceeding. (*Pennsylvania v. Ritchie, supra,* 480 U.S. at p. 57; *People v. Martinez, supra,* 47 Cal.4th at p. 453.) Among Jane Doe's confidential medical and psychiatric records, we found no material evidence worthy of disclosure that has not already been disclosed. (See, e.g., *People v. Martinez, supra,* 47 Cal.4th at p. 454.)

E. Brady *Issue*

Bonella also suggests the prosecution failed to disclose records that would have provided exculpatory evidence to the defense. (See *Brady v. Maryland* (1963) 373 U.S. 83 (*Brady*).) The due process clause requires the state to give an accused all exculpatory

32

material in its possession even if the evidence is privileged.  If the state asserts the privilege, the trial court must examine the items in camera to determine if they are material to guilt or innocence, such as if they might undermine the complaining witness's credibility.  (*Pennsylvania v. Ritchie, supra,* 480 U.S. at pp. 56-58; *People v. Webb, supra,* 6 Cal.4th at p. 518.)  Records of voluntary treatment by private therapists are not records in possession of the state within the meaning of this due process analysis.  The prosecution had no greater access to them than did Bonella.  (See *People v. Webb, supra,* 6 Cal.4th at p. 518.)  Even if the lack of state possession were not dispositive of this claim of error on appeal, our review of the sealed records satisfies us that the undisclosed aspects of those records provide no exculpatory evidence that deprived Bonella of a fair trial.  (See *Pennsylvania v. Ritchie, supra,* 480 U.S. at p. 56.)

## VI.  PROSECUTORIAL MISCONDUCT

A.  *Legal Standard*

Next, Bonella contends that the prosecution committed various acts of misconduct during closing argument.  He reasons that this misconduct deprived him of his state and federal constitutional rights to due process and a fair trial, warranting reversal.  In the trial court, he objected to some aspects of the prosecution's argument without success.  Some of these objections formed the basis of his motion for mistrial on prosecutorial misconduct grounds, which the trial court denied.

To be reversible error under federal standards, prosecutorial misconduct must infect the trial in so unfair a manner that it renders the resulting conviction a denial of due process.  (*Darden v. Wainwright* (1986) 477 U.S. 168, 181; *People v. Dykes* (2009) 46 Cal.4th 731, 760; *People v. Cash* (2002) 28 Cal.4th 703, 733.)  Under state law, prosecutorial comment falling short of the federal standard is prosecutorial misconduct if it involves the use of deceptive or reprehensible methods to attempt to persuade the jury or the court.  (*People v. Dykes, supra,* 46 Cal.4th at p. 760; *People v. Cash, supra,* 28 Cal.4th at p. 733; *People v. Woods* (2006) 146 Cal.App.4th 106, 111.)  Misconduct does not require bad faith on the part of the prosecutor, nor an appreciation of the wrongfulness of the conduct.  (*People v. Bradford* (1997) 15 Cal.4th 1229, 1333; *People*

33

*v. Estrada* (1998) 63 Cal.App.4th 1090, 1096.) On appeal, we determine whether there is a reasonable likelihood that the jury would have or could have construed or applied any of the remarks that Bonella complains of in an objectionable manner. (See *People v. Cash, supra,* 28 Cal.4th at p. 733; *People v. Ochoa* (1998) 19 Cal.4th 353, 427.)

B. *Specific Claims*

       1. *Shifting Burden of Proof*

Bonella contends that the prosecutor's argument that he offered no evidence that child sexual abuse could not occur without some physical evidence constituted an improper attempt to shift the burden of proof to him. During closing argument, the prosecution reminded the jurors that experts had testified that it was not uncommon for a young child to be sexually molested without any medical evidence to show that the molestation had occurred. If Bonella argued that there was no medical evidence to support Jane Doe's allegations, the prosecution urged the jurors to recall this expert testimony. She also told the jury that she had the burden of proof beyond a reasonable doubt.

In his closing argument, defense counsel argued that if Bonella had vaginal and anal intercourse with a child, Jane Doe would have some ripping, tearing, or scarring. Someone would have observed some bleeding, he reasoned. He argued that there was no physical evidence to support her sexual abuse claims. During rebuttal, the prosecutor observed that Bonella did not call any medical witnesses to testify that Jane Doe would have necessarily had some physical scars from the childhood molestation if it had occurred. Bonella objected that this argument shifted the burden of proof, but the trial court overruled the objection. He raised the same objection in his motion for mistrial, but the trial court rejected it, finding that the argument was proper.

On appeal, Bonella contends that this argument shifted the burden of proof to him. We disagree. The prosecution has broad latitude to describe factual flaws in the defense argument. (*People v. Cash, supra,* 28 Cal.4th at p. 733; *People v. Ellison* (2011) 196 Cal.App.4th 1342, 1353.) Typically, the prosecutor has the right to make a fair comment on, and to argue any reasonable inferences or deductions arising from the evidence.

Comments on the state of the evidence or the defendant's failure to rebut the prosecution's case are permitted. (*People v. Ellison, supra,* 196 Cal.App.4th at p. 1353; *People v. Woods, supra,* 146 Cal.App.4th at p. 112.)

It is true that the prosecution has a duty to prove every fact necessary to constitute the charged crime beyond a reasonable doubt. (*In re Winship* (1970) 397 U.S. 358, 364.) Accordingly, it may not suggest that a defendant has the burden of producing evidence or of proving innocence. (*People v. Woods, supra,* 146 Cal.App.4th at p. 112.) However, we are satisfied that this argument was not an improper attempt to shift the burden of proof, but a permissible comment on the lack of evidence to support the defendant's theory. In fact, the prosecution reiterated the trial court's instruction that it had the burden of proof of the defendant's guilt beyond a reasonable doubt. (See *People v. Young* (2005) 34 Cal.4th 1149, 1195-1196; *People v. Bradford, supra,* 15 Cal.4th at p. 1340.) In the case before us, the prosecutor did not cross the critical line between proper and improper argument. There is no reasonable likelihood that the jury understood the argument as shifting the burden of proof to Bonella. (See, e.g., *People v. Young, supra,* 34 Cal.4th at p. 1196.)

2. *Fabricating Evidence*

Bonella also contends that the prosecutor improperly impugned the integrity of defense counsel by suggesting that he made up evidence. After the rebuttal argument about Bonella's failure to call a medical expert to support his theory that intercourse with a small child would necessarily have left physical evidence, the prosecutor reminded the jurors that the trial court had instructed them that what the attorneys said was not evidence. She reasoned that this instruction was particularly pertinent in a case such as this when the defense—dissatisfied with the evidence—would "make up new evidence" for the jury to consider. Bonella's objection that this argument was improper was overruled.

A prosecutor commits misconduct by attacking the integrity of defense counsel by suggesting that the defense has fabricated evidence. These irrelevant claims do not constitute comment on the evidence or the inferences to be drawn from it. (*People v.*

*Cash, supra,* 28 Cal.4th at p. 732; *People v. Vance* (2010) 188 Cal.App.4th 1182, 1200-1201.) However, when viewed in context, it seems that the argument was little more than one pointing out that the defense was attempting to confuse the issues and urging the jurors to focus on the relevant evidence. That sort of argument is not improper. (*People v. Hillhouse* (2002) 27 Cal.4th 469, 502.) Even if we assume arguendo that the prosecution's brief comment was improper, we would find that the error was cured by the trial court's twice-repeated admonition that argument is not evidence, made when faced with other objections to prosecutorial argument. (See, e.g., *People v. Young, supra,* 34 Cal.4th at p. 1196; *People v. Cash, supra,* 28 Cal.4th at p. 734.)

3. *Viewing Evidence Through Jane Doe's Eyes*

Next, Bonella contends that the prosecutor improperly urged the jury to view the case from Jane Doe's perspective. In so doing, he reasons, the prosecution made an improper appeal to the jury's sympathy and asked the jurors to become partisans for the victim. During argument, the prosecution asked the jurors to think about their first sexual experience. Bonella's objection to this as improper argument was overruled. The prosecutor spoke about Jane Doe's demeanor during her testimony, asking the jurors to imagine having to describe their first sexual experience in detail, in public to a group of strangers.

A prosecutor may not argue to the jury in a manner that suggests that the jurors should be ruled by emotion, rather than reason. Inappropriate appeals to sympathy or passion divert the jurors' attention from their proper role to weigh the evidence in an unbiased and unprejudiced manner. Asking jurors to view the crime through the eyes of the victim is an example of this type of misconduct. (*People v. Vance, supra,* 188 Cal.App.4th at pp. 1192-1193, & fn. 8.) However, even this argument can be a reasoned rebuttal to a defense argument rather than an appeal to juror's sympathies, if the comments had a permissible purpose. (*People v. Leonard* (2007) 40 Cal.4th 1370, 1406.) We conclude that such a permissible purpose existed in this matter. Attempting to counter Bonella's claim that Jane Doe gave false testimony against him, the prosecutor argued that it was unlikely that the complaining witness would undergo the embarrassing

36

ordeal of a protracted trial unless she had endured the molestation. The trial court properly rejected Bonella's challenge to this argument.

### 4. *Evil Predator Description*

Bonella next contends that the prosecutor committed misconduct by describing him as evil and as a predator. He reasons that this argument was an improper inflammatory device to divert the jury's attention from its role, inviting an irrational, purely subjective response to him. The defense's argument was that Jane Doe's testimony was preposterous—so fantastic that it became incredible, such that the prosecution did not prove its case beyond a reasonable doubt. During rebuttal, the prosecutor observed that the defense was arguing that Jane Doe's testimony about molestation was "so terrible and depraved it couldn't possibly be true"—in essence, that no one would rape a four-year-old child. Bonella objected that this misstated his argument. The trial court allowed the argument to continue, admonishing the jurors that its task was to determine whether the facts were true, and to apply the arguments to those facts. It reminded the jurors that the arguments were not evidence.

The prosecutor continued, arguing that history showed that some humans do commit evil acts against others. In this case of atrocities and evil, she cautioned the jurors against acquitting Bonella based on a false belief that no one could have done such a thing to a child. As one who secretly preyed on children, Bonella was a predator, the prosecutor argued. This prompted an improper argument objection from Bonella, which was overruled. Later, the prosecutor argued that evil existed and that the jurors had been "sitting in a room with it." This prompted another improper argument objection from Bonella, which the trial court also overruled. His motion for mistrial on prosecutorial misconduct grounds based on this argument was also denied, as the trial court viewed it as a proper comment on the evidence.

We also reject this claim of prosecutorial misconduct. A prosecutor may not make an argument that appeals to the jury's sympathy or passions. (*People v. Vance, supra,* 188 Cal.App.4th at pp. 1192-1193, & fn. 8.) However, the prosecution may make vigorous arguments and even use epithets if they are warranted by the evidence, as long

as the argument is not inflammatory and principally aimed at arousing the jury's prejudices and passions.  (*People v. Young, supra,* 34 Cal.4th at p. 1195.)  Given the testimony of four witnesses that he molested them when they were children, the prosecutor's description of Bonella as a predator was supported by the record.  Also, argument must be judged in context.  (*Boyde v. California* (1990) 494 U.S. 370, 385; *People v. Gonzalez* (1990) 51 Cal.3d 1179, 1224, fn. 21, disapproved on other grounds in *Barnett v. Superior Court* (2010) 50 Cal.4th 890, 898.)  Viewed in the light of Bonella's defense that Jane Doe's allegations were so evil as to be unbelievable, the prosecution's assessment that the defendant was evil was a reasonable comment on the evidence.  (*People v. Young, supra,* 34 Cal.4th at p. 1195.)

        5.  *Lack of Evidence of Financial Gain*

        Bonella contends that the prosecutor committed misconduct and misled the jury by arguing that there was no evidence that Jane Doe enjoyed any financial gain from prosecuting this case, after it failed to disclose benefits she received and successfully urged the exclusion of that evidence.  When arguing that Jane Doe was a credible witness, the prosecutor argued that she had no other motive to testify other than to tell the truth.  In response to suggestions that Jane Doe filed false charges against Bonella, the prosecutor argued that there was no evidence that the victim would realize any financial gain.  "What could she possibly stand to gain [from filing false charges]? . . . . She's not getting paid to be here."  Bonella did not object to this argument as it was being made, but he did make an improper argument objection outside the presence of the jurors soon afterward.  He contended that the argument was improper because the prosecution did not provide him with the information he sought about compensation.  The trial court ruled that the type of victim reimbursement that Bonella alleged that Jane Doe had received did not constitute financial gain that could form the basis of a credibility attack on the basis of bias.  Thus, it concluded that the prosecution's argument accurately reflected the record in the case and did not constitute prosecutorial misconduct.

        We have already determined that the evidence that Bonella sought to admit was properly excluded.  (See pt. III.B., *ante*.)  Thus, his argument that Jane Doe had a

financial motive to lie about suffering sexual abuse at his hands was fatally flawed. The prosecution did not leave the jury with a false impression that no evidence of financial motive existed when she knew that it did. Her argument that there was no evidence that the victim had any financial motive to lie was a proper comment on the evidence. (*People v. Cash, supra,* 28 Cal.4th at p. 733; *People v. Osband* (1996) 13 Cal.4th 622, 697.)[27] The trial court properly denied Bonella's motion for mistrial.

## VII.  NEW TRIAL

A.  *Legal Principles*

Finally, Bonella contends that the trial court erred by denying his motion for new trial. He reasons that newly discovered evidence bearing on Jane Doe's credibility required a new trial and that the trial court's failure to grant one violated his federal constitutional right to due process. (U.S. Const., 14th Amend.) As developed during the trial court's consideration of Bonella's motion for new trial, the issues centered on three categories of newly discovered evidence. (§ 1181, subd. (8).) Ultimately, the trial court rejected all three related theories of Bonella's motion for new trial and denied that motion.

A criminal defendant may move for a new trial on the ground of newly discovered evidence. (§ 1181, subd. 8.) To entitle a party to a new trial, the motion must show inter alia that the newly discovered evidence was material and was not merely cumulative. (*People v. Howard* (2010) 51 Cal.4th 15, 43; *People v. Delgado* (1993) 5 Cal.4th 312, 328; *People v. Sutton* (1887) 73 Cal. 243, 247; *People v. Drake* (1992) 6 Cal.App.4th 92, 98.) The trial court must also determine, based on an objective standard, whether the new evidence was of sufficient strength to indicate that a different result was probable in a retrial that included the presentation of this evidence. (*People v. Turner* (1994) 8 Cal.4th 137, 212, disapproved on other grounds in *People v. Griffin* (2004) 33 Cal.4th 536, 555, fn. 5, disapproved on other grounds in *People v. Riccardi* (2012) 54 Cal.4th 758, 824,

---

[27] As we find no error resulting from the prosecutor's argument, we necessarily reject Bonella's suggestion that his conviction should be reversed on cumulative error grounds.

39

fn. 32; *People v. Huskins* (1966) 245 Cal.App.2d 859, 862; see *People v. Green* (1982) 130 Cal.App.3d 1, 12; see also 6 Witkin & Epstein, Cal. Criminal Law (2012) Criminal Judgment, § 105, pp. 146-148.)  On appeal from an order denying a new trial sought on this ground, we apply the same test, determining such issues as the materiality of the evidence and whether a different result on retrial was reasonably probable in light of the evidence.  (*People v. Martinez* (1984) 36 Cal.3d 816, 821.)

Ultimately, a motion for new trial is a matter for the trial court's discretion.  Once the court has denied the motion, its exercise of its discretion will not be overturned on appeal absent a manifest abuse of discretion.  On appeal, we assess this question based on the facts and circumstances of the underlying case.  (*People v. Guerra* (2006) 37 Cal.4th 1067, 1159-1160, disapproved on another ground in *People v. Rundle* (2008) 43 Cal.4th 76, 151, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22; *People v. Martinez, supra,* 36 Cal.3d at p. 821; *People v. Delgado, supra,* 5 Cal.4th at p. 328.)

B.  *New Evidence*

     1.  *Jane Doe's Fabricated Claim of Abuse against Ron*

          a.  *Trial Court Ruling*

Bonella's claim of error requires us to consider three basic categories of newly discovered evidence.  In the trial court, he first offered July 2009, and September 2010, Pleasant Hill police reports and a related CPS investigation as newly discovered evidence warranting a new trial.[28]  He argued that this evidence showed that Jane Doe made an allegation that her father Ron had sexually abused her minor daughter, that this allegation

---

[28] The parties stipulated that the statements in the police reports could be deemed to be declarations for purposes of the motion for new trial.

was fabricated, and that the false allegation against Ron supported his defense that she fabricated claims of sexual abuse against him, as well.[29]

This ground for new trial was related to issues that arose earlier in the proceedings. Before trial, Bonella unsuccessfully sought to admit evidence that Ron asked for guardianship of Jane Doe's minor child after Jane Doe attempted suicide in April 2009. During trial, he wanted to question Jane Doe about her report in the guardianship proceeding that her daughter was required to sleep in Ron's bed and that he sometimes wore nothing more than briefs to bed. He reasoned that this report insinuated that Ron was molesting her daughter. Bonella argued that Jane Doe was using the court system to falsely attack her father, just as she was using the criminal system to falsely attack him. The trial court—finding no evidence of any false allegation or abuse of process—ruled that Bonella could not pursue this line of questioning. (Evid. Code, §§ 350, 352.)

When Bonella raised a similar claim of fabrication in his motion for new trial, he did not fare any better. The trial court rejected his theory that Jane Doe made a false accusation against Ron as speculative, in part because the allegation was not made by Jane Doe.[30] It noted that in the September 2010 police report, Jane Doe reported that she trusted Ron, that he had never abused her, and that she was uncertain whether her child's report was true. The trial court also concluded that even if the evidence had minimal relevance, that probative value was substantially outweighed by its prejudicial effect. (Evid. Code, § 352.)

---

[29] As both events focus on the same claim—that Jane Doe made a false allegation of sexual abuse against Ron—we consider the 2009 police report and accompanying CPS investigation along with the allegations that arose in the 2010 guardianship proceedings as a single topic.

[30] In 2009, Jane Doe did not raise this issue with authorities, but responded to police inquires made after a counselor repeated concerns that she had raised with this mandatory reporter. In 2010, Jane Doe repeated allegations that her child had made, but expressly stated that she did not know whether they were true.

b. *No Allegation from Jane Doe*

Evidence of prior false allegations of sexual misconduct would be admissible to impeach Jane Doe's credibility in this lewd conduct action. (See *People v. Franklin* (1994) 25 Cal.App.4th 328, 335; *People v. Burrell-Hart* (1987) 192 Cal.App.3d 593, 597-599; see Evid. Code, §§ 780, 787, 1100.) This claim of error assumes that Jane Doe actually made an allegation of sexual misconduct against Ron. The trial court found that this evidence did not establish that Jane Doe made any accusation against Ron. Having reviewed the sealed records in this matter, we agree that Jane Doe did not accuse her father. As the proffered evidence had no tendency in reason to show that Jane Doe's allegations against Bonella were fabricated, it was irrelevant and inadmissible. It necessarily follows that this evidence could not have led to a different verdict on retrial. (See Evid. Code, §§ 210, 350; *People v. Howard, supra,* 51 Cal.4th at p. 43.)

2. *Jane Doe's Misdemeanor Misconduct*

a. *Trial Court Ruling*

A second category of new evidence arose from the July 2009 police report. It showed that a misdemeanor warrant against Jane Doe was issued in 2007 for the negligent discharge of a firearm. (Former § 246.3 [Stats. 2006, ch. 180, § 1, pp. 1910-1911].)[31] In the trial court, Bonella argued that the warrant constituted exculpatory evidence that should have been disclosed and that would have been admissible impeachment evidence. The prosecution had turned over Jane Doe's rap sheet to Bonella, based on her birth name. It showed no arrests or warrants. The 2007 warrant was issued for Jane Doe using her then-married name, after an attempt at diversion was unsuccessful.

The trial court obtained the court file, which showed an allegation that Jane Doe had shot at a possum that threatened chickens in her backyard. A neighbor called the police, not to prosecute, but because a window may have been broken. Jane Doe admitted to police that she discharged the firearm. The negligent discharge of a firearm

_____

[31] Violation of this statute may also result in a felony conviction, but the warrant charged it as a misdemeanor. (Former § 246.3.)

42

charge did not result in a conviction. Ultimately, the trial court ruled that it probably would have found the evidence more prejudicial than probative. (Evid. Code, § 352.) Even if the evidence was admitted, the trial court concluded that it would not have had sufficient impeachment value on the lewd conduct charges that it would have made a different verdict reasonably probable.

### b. *Inadmissible Evidence*

Evidence of a misdemeanor *conviction* is inadmissible hearsay. (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 178; *People v. Wheeler* (1992) 4 Cal.4th 284, 297-300.) Conduct underlying a misdemeanor offense may be admissible impeachment evidence if the misconduct involved moral turpitude and suggests a willingness to lie. (*People v. Wheeler, supra,* 4 Cal.4th at p. 295; *People v. Martinez* (2002) 103 Cal.App.4th 1071, 1080-1081; see *Davis v. Alaska, supra,* 415 U.S. at p. 316 [credibility evidence].) Still, the trial court has discretion to exclude the facts underlying a misdemeanor offense under section 352 of the Evidence Code if the presentation of those facts would create undue prejudice, delay or confusion that substantially outweighed the probative value of those facts. (*People v. Letner and Tobin, supra,* 50 Cal.4th at p. 178; *People v. Wheeler, supra,* 4 Cal.4th at pp. 296-297; *People v. Feaster* (2002) 102 Cal.App.4th 1084, 1093-1094.)

The Bonella court ruled that the proffered evidence of Jane Doe's misdemeanor misconduct would have been excluded on retrial as more prejudicial than probative. The charged offense was negligent discharge of a firearm, requiring the willful and unlawful discharge of a firearm in a grossly negligent manner that could result in a person's death or injury. (Former § 246.3, subd. (a); *People v. Feaster, supra,* 102 Cal.App.4th at p. 1093.) The willful discharge of a firearm in a such a manner is an act of moral turpitude. (*People v. Feaster, supra,* 102 Cal.App.4th at pp. 1092-1093.) However, misdemeanor conduct is inherently less probative than felony misconduct, because it is a less forceful indicator of immoral character or dishonesty than a felony would be. (*People v. Letner and Tobin, supra,* 50 Cal.4th at p. 178; *People v. Wheeler, supra,* 4 Cal.4th at p. 296.)

We share the trial court's apparent view that the underlying conduct had little probative value. The facts of the case are not particularly troubling. The evidence was

43

highly prejudicial within the meaning of the trial court's statutory authority to exclude even relevant evidence. (§ 352.) The introduction of this evidence would have created a significant danger of undue consumption of time and undue prejudice. These factors substantially outweighed the marginal probative value of the underlying incident of misconduct. (See, e.g., *People v. Feaster, supra,* 102 Cal.App.4th at pp. 1093-1094; see also pt. VII.C., *post.*) The trial court would have acted within its discretion if it excluded this evidence on retrial.

### c. *No* Brady *Violation*

Bonella also claims that the trial court erred when it ruled that the prosecutor's failure to turn over evidence of the outstanding warrant to him did not constitute *Brady* error. Prosecutorial suppression of evidence favorable to an accused—including impeachment evidence—violates the defendant's due process rights. The duty to disclose extends to evidence known to police investigators, even if unknown to the prosecutor. This duty obligates the prosecution to learn of any favorable evidence known to others acting on the government's behalf in the case, including the police. (*Brady, supra,* 373 U.S. 83, 87; *People v. Letner and Tobin, supra,* 50 Cal.4th at p. 175.) A defendant is entitled to learn of any California criminal charges pending against a prosecution witness. (*People v. Hayes* (1992) 3 Cal.App.4th 1238, 1245; *People v. Coyer* (1983) 142 Cal.App.3d 839, 842.) The fact of pending charges can be used to impeach a prosecution witness. (*People v. Martinez, supra,* 103 Cal.App.4th at p. 1080; *People v. Coyer, supra,* 142 Cal.App.3d at p. 842.)

Despite this, no true *Brady* violation occurs unless the prosecution failed to disclose evidence of sufficient materiality and strength that there is a reasonable probability that if the evidence had not been suppressed, it would have resulted in a different verdict. Thus, the issue of prejudice turns on the materiality of the evidence to the issue of guilt or innocence. (*People v. Letner and Tobin, supra,* 50 Cal.4th at pp. 175-176.) Evidence is not material unless it was admissible. (*Id.* at p. 176.) As we have already found, the evidence of the outstanding warrant would properly have been

excluded as more prejudicial than probative. (See pt. VII.B.2.b, *ante*; see also VII.C., *post*.)

 3. *Lay Opinion Evidence of Jane Doe Credibility*

 a. *Trial Court Ruling*

A third category of newly discovered evidence was offered at the hearing on the motion for new trial—opinion evidence of various members of Jane Doe's family that they did not believe that she told the truth in Joseph Bonella's trial. The trial court ruled that the proffered evidence of laypersons' opinions of Jane Doe's credibility would be inadmissible on retrial.

 b. *Inadmissible Evidence*

We also reject this aspect of Bonella's new trial claim of error because we also conclude that the proffered evidence would not be admissible at a new trial. Generally, lay opinion testimony about the veracity of specific statements made by another is inadmissible. (*People v. Melton* (1988) 44 Cal.3d 713, 744.) More than that, newly discovered evidence tending to impeach a witness is an insufficient ground for granting a new trial, absent an exceptional showing of impeachment. To warrant a new trial, the new evidence must render a different verdict reasonably probable on retrial. (*People v. Long* (1940) 15 Cal.2d 590, 607-608; *People v. Ah Noon* (1897) 116 Cal. 656, 657-658.)

When the new evidence contradicts the strongest evidence introduced against the defendant, a new trial should be granted. (*People v. Delgado, supra,* 5 Cal.4th at p. 329.) In Bonella's case, the strongest evidence against him outside of Jane Doe's own testimony was the corroborating testimony of G.P., L.B. and R.H. about his childhood sexual abuse of each of them. Even if the opinions of family members disputing the validity of Jane Doe's allegations against Joseph were admitted on retrial, there is no reasonable likelihood that this new evidence would result in a different outcome. (See pt. VII.C., *post.*)

C. *No Likelihood of Different Result*

Even if Bonella were to overcome the other obstacles to admissibility of his newly discovered evidence, he cannot show that any of that evidence created the likelihood of a

different result on retrial. Viewed in the light most favorable to him, all of the newly discovered evidence tended to undermine Jane Doe's credibility. However, in addition to the verdicts on the substantive charges against Bonella, the jury also made findings that supported the filing of the charges within the statute of limitations. (§ 803, subd. (f).) In so doing, the jury specifically found that each of Jane Doe's eight allegations of lewd conduct was clearly and convincingly corroborated by independent evidence.

These findings compel the conclusion that the testimony of G.P.—and to a lesser degree, of L.B. and R.H.—convinced the jurors that Bonella engaged in a pattern of lewd conduct with defenseless young girls who became available to him where he lived. These findings gave the trial court one of its reasons to deny Bonella's motion for new trial. Similarly, they satisfy us that the proffered new evidence would not create the likelihood of a different result on retrial. (See *People v. Howard, supra,* 51 Cal.4th at p. 43; see also *People v. Feaster, supra,* 102 Cal.App.4th at p. 1094 [harmless error].) Thus, we conclude that the trial court did not abuse its discretion when it denied the motion for new trial. (See *People v. Guerra, supra,* 37 Cal.4th at p. 1159-1160.)[32]

The judgment is affirmed.

_____
Reardon, J.

We concur:

_____
Ruvolo, P.J.

_____
Rivera, J.

---

[32] Bonella argues that the cumulative effect of the errors arising at trial deprived him of due process and a fair trial. We disagree. Even when viewed together, the errors committed in the trial court—which were few in number and of minimal significance—could not have resulted in a miscarriage of justice. (See *People v. Ashmus* (1991) 54 Cal.3d 932, 1006, disapproved on other grounds in *People v. Yeoman* (2003) 31 Cal.4th 93, 117-118.)